## Case No. 8,740.

### McCULLOCH et al. v. TAYLOR et al.

[1 Wkly. Notes Cas. 391.]

Circuit Court, E. D. Pennsylvania. April 22, 1875.

BILLS—ACCEPTOR — LETTER OF CREDIT—ISSUER—OFFSET.

The acceptor of bills drawn under the usual forms of commercial letters of credit can compel the holder of the letter to furnish funds to meet the acceptances; and a debt due by the issuer of the letter to the holder cannot be set off against this obligation.

In equity. This case was heard on bill, answer, and proofs. The bill averred the existence, prior to 18th September, 1873, of two firms, viz., Jay Cooke & Co., and Jay Cooke, McCulloch & Co., doing business as bankers in Philadelphia and London respectively. The firms were in no way connected, except that a number of persons (not including the plaintiffs) were members of both firms. The plaintiffs were the only members of the firm of Jay Cooke, McCulloch & Co. who were not also members of the other firm. During 1873 Jay Cooke & Co. issued to the defendants N. & G. Taylor Co. several commercial letters of credit for £10,000 each, drawn on Jay Cooke, McCulloch & Co. The letters of credit were in the following form: "No. ———. Philadel-

phia, ———, 187—. Sir: We hereby authorize you or such parties as you may direct to value on Messrs. Jay Cooke, McCulloch & Co. of London, in drafts at four months to the extent of ten thousand pounds (£10,000) for account of N. & G. Taylor, drafts to be drawn in within six months from this date for the costs of tin plates to be exported to an Atlantic port in the United States, and advice thereof to be given to Messrs. Jay Cooke, McCulloch & Co., accompanied by certified invoices, consul's certificates, policies of insurance, and bills of lading to order of Jay Cooke & Co. We hereby agree with the drawers, endorsers and bona fide holders of bills drawn under and in compliance with the terms of this credit that the same shall be duly honored upon presentation at the counting house of Messrs. Jay Cooke, McCulloch & Co. in London. Very truly yours, ———————." Accompanying each of these documents was a receipt, in the following form: "New York, ———, 187—. Received from Messrs. Jay Cooke & Co. the letter of credit of which annexed is a copy, in consideration whereof we hereby agree to provide them with sufficient and satisfactory funds to meet the payment of all bills drawn under it twenty days before the maturity of the same in London, respectively, either in cash at their drawing rate, or in bankers' bills payable at not exceeding sixty days sight in London, endorsed by us and approved by them, it being understood that they may decline any bills, however good, at their discretion. We also agree to give security for the same at any time if required by the said Jay Cooke & Co.; and further, that all property purchased under the said credit, and the proceeds thereof, together with the policies of insurance thereon (which we agree to effect) and the bills of lading are hereby pledged and hypothecated to Jay Cooke & Co., and Jay Cooke, McCulloch & Co., as collateral security for the fulfilment of this contract, and are held subject to their order, with authority to take possession and dispose of the same at discretion for account of whom it may concern, charging all expenses, including commission for sale and guarantee, and applying the proceeds for their security or reimbursement. And we further pledge, as security for any other indebtedness of our firm to Jay Cooke & Co. or Jay Cooke, McCulloch & Co. any surplus that may remain either in the property or the proceeds thereof after providing for the acceptances under said credit. On all drafts drawn under said credit we agree to pay one per cent. commission, and interest at five per cent., or the Bank of England rate if higher. We further authorize you to cancel the said credit at any time to the extent it shall not have been acted upon when notice of revocation is received by the user. This obligation is to continue in force notwithstanding any changes in the individuals composing either of the firms par-

ties to this contract, or in that of the user of the credit."

These receipts were signed by the defendants. Under these letters goods were purchased and bills drawn on Jay Cooke, McCulloch & Co., which were accepted and paid at maturity by them. On 18th September, 1873, Jay Cooke & Co. stopped payment, and were on 26th November, 1873, adjudicated bankrupts. Up to that time N. & G. Taylor Co. had made payments to Jay Cooke & Co. pursuant to their engagement to meet the bills drawn under the letters of credit. On the day of the suspension of Jay Cooke & Co. there was outstanding a letter of credit, under which bills had been drawn and accepted by Jay Cooke, McCulloch & Co., and together amounting to £22,678 19s. 7d. sterling, over and above the amounts that had before that date been paid to Jay Cooke & Co. by N. & G. Taylor Co.; there was also due for commissions £226 15s. 10d. sterling, and £9 17s. for stamps. For the sum of £22,678 19s. 7d., Jay Cooke, McCulloch & Co. had made themselves liable by accepting bills drawn under the letters of credit, and N. & G. Taylor Co. had not paid Jay Cooke & Co., or Jay Cooke, McCulloch & Co., anything on account of the same. After the suspension of Jay Cooke & Co., and in anticipation of the bankruptcy that ensued, that firm, believing that the equitable right to be paid for the amount advanced under the letters of credit was in Jay Cooke, McCulloch & Co., who had agreed to make the advances, and who alone were competent to carry out their contract, and who ultimately did so by paying their acceptances, consented, at the instance of the agent of Jay Cooke, McCulloch & Co., to hand over the documents to Drexel & Co., as agents of Jay Cooke, McCulloch & Co., to collect the balance due or to become due from N. & G. Taylor Co. under their contracts above set forth. In September, 1873, after the suspension of Jay Cooke & Co., two of the consignments of goods purchased under the letters of credit arrived. The goods were consigned, according to the agreement, to Jay Cooke & Co., as collateral security for the performance by N. & G. Taylor Co. of their contract to provide funds. These bills of lading were handed over to the Messrs. Taylor Co. upon their signing a contract in this form, one on the 24th, and the other on the 29th of September, 1873: "Philadelphia, Sept. 29, 1873. Received from Hugh McCulloch, Philadelphia, the merchandise specified in the bill of lading, per Pennsylvania, dated 10th of Sept., 1873: * * * 1207 boxes tin plates * * * And in consideration thereof we hereby agree to hold said goods in trust, with liberty to sell the same, and in case of sale, to hand the avails, as soon as received, to Hugh McCulloch, as security for due provision for the acceptance of Jay Cooke, McCulloch & Co., of London, on our account noted at foot; and we further pledge to them said goods, and proceeds thereof, as security for the payment of any other indebtedness of ourselves to Hugh McCulloch, or Jay Cooke, McCulloch & Co. We further agree to keep said property insured against fire, payable in case of loss, to Hugh McCulloch, with the understanding that they are not to be chargeable with any expenses incurred thereon, the intention of this arrangement being to protect and preserve, unimpaired, the lien of Hugh McCulloch, and Jay Cooke, McCulloch & Co., on said property. N. & G. Taylor Co."

After the delivery to them of these goods, as above, N. & G. Taylor Co. continued to make payments to Drexel & Co., as agents of Jay Cooke, McCulloch & Co., of the amounts they were bound to pay on their contracts, and these were all made after the adjudication of Jay Cooke & Co. as bankrupts. The proceeds of the goods received were more than enough to pay the claims of plaintiffs. The bill prayed for discovery, and that a decree should be made ascertaining plaintiffs' rights to receive the amount due by defendants as against any claim by the assignee in bankruptcy of Jay Cooke & Co. The material facts alleged in the answer were as follows: They had been in the habit of transacting business which required the payment of large sums annually in England and Scotland. When the exact amount of these payments was known to defendants, they purchased sight drafts from Jay Cooke & Co. on Jay Cooke, McCulloch & Co., paying for them as received. But where they did not know the exact amount required, they bought of Jay Cooke & Co. the right of drawing on Jay Cooke, McCulloch & Co. any amount which they might require, and this was done through the medium of the open letters of credit alluded to in the bill. Defendants drew drafts on Jay Cooke, McCulloch & Co. by virtue of these open letters, having, at the time of purchasing the latter, agreed to pay Jay Cooke & Co., at Philadelphia, in U. S. currency, the equivalent of each draft drawn, twenty days before maturity thereof in London, with one per cent. commission.

When Jay Cooke & Co. stopped payment, defendants did not know that there existed any probability of insolvency. Defendants denied that Jay Cooke, McCulloch & Co. were either alone competent to carry out their contracts in regard to the drafts in question, or that they actually did so by paying their acceptances, except to the extent of £2761 13s. 4d. The acceptances were paid through Jay Cooke, McCulloch & Co. by defendants, who supplied the funds in each case a short time before the acceptance became due. On 18 September, 1873, there was out a sight draft of Jay Cooke & Co. on Jay Cooke, McCulloch & Co. for £2264 7s. 11d., for which defendants had paid Jay Cooke & Co. in full; and there were three open letters of credit, as aforesaid, each for

£10,000, for which they had agreed to pay Jay Cooke & Co., in Philadelphia, twenty days before the maturity in London of each draft drawn thereunder. On receiving the bills of lading for each lot of merchandise, defendants had signed to Jay Cooke & Co. a printed receipt, identical with the one set forth above, under date of 29 Sept., 1873, except that the name of Jay Cooke & Co. was printed therein, wherever the name of Hugh McCulloch occurs in the above receipt. On arrival of the Pennsylvania, 23 September, 1873, defendants, for their own protection, called on Jay Cooke & Co. for the purpose of stopping in transitu such merchandise as had been consigned to Jay Cooke & Co. for them. They were informed that Jay Cooke & Co. were solvent; that the bills of lading had been transferred to Hugh McCulloch, and were held for him by Drexel & Co.; that all acceptances would be paid by Jay Cooke, McCulloch & Co., by which firm the draft for £2264 7s. 11d. would be also accepted and paid. As the indebtedness of defendants on the drafts drawn on Jay Cooke, McCulloch & Co. matured (after the 18th of September, 1873), defendants bought drafts of Drexel & Co., and sent them to Jay Cooke, McCulloch & Co. to be applied to the payment of the particular acceptances about to mature, describing them specifically. Defendants understood when sending them that said drafts were so indorsed that they could not be used except to pay the specific acceptances then becoming due. The said draft for £2264 7s. 11d. was actually protested for non-payment on the 23 September, 1873. It remains still unpaid. Defendants had paid for all drafts drawn on Jay Cooke, McCulloch & Co. before the same matured, including commissions, etc., excepting the sum of £2761 13s. 4d. on the last draft drawn by them, from which amount they claimed that they had a right to deduct the amount of the draft of Jay Cooke & Co., aforesaid, for which they had paid Jay Cooke & Co. They admitted that they would be liable to the latter £2761 13s. 4d., provided the last-mentioned draft had been paid.

Sydney Biddle and Mr. McMurtrie, for plaintiff.

This transaction is simply an agreement by one firm (Jay Cooke & Co.) that another firm (Jay Cooke, McCulloch & Co.) shall accept drafts drawn on them by the defendants, for a profit of one per cent. to be divided between the firms. Defendants agree to supply funds to meet the acceptances before they become due. The agency of Jay Cooke & Co. in the matter was merely to pledge themselves for the reliability of the defendants. The contract was this: The English firm agreed to accept drafts for defendants, provided they were assured of the latter's credit. The American firm assumed the responsibility of assuring the credit of defend-

ants, and the latter agreed to supply the English firm with the necessary funds to meet the acceptances before they matured. It is merely a loan of their credit by the two banking firms to defendants, who are liable to the English firm for the amount of their drafts. The latter can resort either to them or to the American firm. As the firms are entirely distinct, there is no set-off possible. The American firm. in receiving funds from defendants to meet the latter's drafts, were the agents of the English firm.

Mr. Fallon, contra.

This was a contract made entirely between defendants and Jay Cooke & Co. They knew Jay Cooke, McCulloch & Co. in the transaction solely as agents of the former. The letter of credit was the basis of the whole transaction. That was purchased from defendants Jay Cooke & Co. exclusively. Jay Cooke & Co. contracted that they should be supplied with certain credit, for which they were to pay Jay Cooke & Co. Defendants would have been liable on a breach of their contract to the Philadelphia firm, not the London firm, and vice versa. They were, therefore, entitled to deduct the amount of the Philadelphia firm's indebtedness to them on the unpaid draft from their debt to the latter. As for the commissions, plaintiffs could in no case claim commissions from defendants, and would have been entitled to but half thereof from Jay Cooke & Co.

Mr. McMurtrie, in reply, was restricted to the question of commissions.

Before McKENNAN, Circuit Judge, and CADWALADER, District Judge.

CADWALADER, District Judge (to defendants' counsel): Do you deny that the drafts have been paid by the English firm?

Fallon: Yes. The drafts were paid by the defendants through the English firm, to whom defendants' other drafts were specially endorsed, payable to the particular drafts in question.

PER CURIAM: But as to the balance?

Fallon: As to that we have a set-off, as our contract to furnish funds is with Jay Cooke & Co. alone.

CADWALADER, District Judge: "McCulloch possesses proof of payment in holding the drafts, and could recover in an action of assumpsit for money paid for defendants. If he had not paid the drafts, he could recover on the ground of his liability thereon for having accepted them."

McKENNAN, Circuit Judge: "This is a very simple question. It was merely a loan by Jay Cooke, McCulloch & Co. of their credit to defendants for a commission. Defendants cannot set off their claims against Jay Cooke & Co. I think plaintiffs are only entitled to half-commissions."

Decree accordingly.